IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HAYNEEDLE, INC., a Nebraska corporation, | ) ) ) | |
| Plaintiff, | ) ) | 8:10CV436 |
| v. | ) ) ) | |
| J.C. PENNEY COMPANY, INC., a Delaware corporation, J.C. PENNEY CORPORATION, INC., a Delaware corporation, and J.C. PENNEY PRIVATE BRANDS, INC., a Delaware corporation, | ) ) ) ) ) ) ) ) | MEMORANDUM AND ORDER |
| Defendants. | ) ) | |

This matter is before the court after an evidentiary hearing on the plaintiff's motion for a preliminary injunction on March 3, 2011. Filing No. 32. This is an action for trademark infringement brought pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and for violations of its common-law trademark rights.

I.  FACTS

In its complaint, Hayneedle alleges that it owns United States Trademark Application Serial No. 85103444, which was filed with the United States Patent and Trademark Office on August 9, 2010, for the trademark THE FOUNDARY, for use on "on-line retail store services featuring home decor sold to members on a limited time sales event basis." Filing No. 1, Complaint at 2-3. It further alleges that it has made actual use of the trademark THE FOUNDARY in interstate commerce throughout the United States, since at least as early as October 15, 2010, in connection with online retail store services featuring a wide

variety of home furnishings, decor and accessories.  *Id.* at 4.  It also alleges it has used the trademark THE FOUNDARY on its website located at www.thefoundary.com and in marketing and promotional materials distributed throughout the United States to offer for sale and sell a wide range of consumer products, including but not limited to furniture, outdoor furniture, children's furniture, kitchen islands, bedding, towels, blankets, table linens, rugs, pillows, garden accessories, toy chests, porch swings, lamps, picture frames, mirrors, chalkboards, candles, home fragrances, fitness products, cookware, bakeware, glassware, small appliances, serving tools, bowls, cutlery, ice cream makers, vacuum cleaners, steam cleaners, outdoor fire pits, outdoor games, wagons, sleds, frozen meat, pet accessories and pet treats.  *Id.* at 5.

Hayneedle also alleges that defendants J.C. Penney Company, Inc., J.C. Penney Corporation, Inc., and J.C. Penney Private Brands, Inc., (hereinafter, collectively, "the defendant" or "J.C. Penney") filed several trademark applications with the United States Patent and Trademark Office, for the trademark THE FOUNDRY, claiming a bona fide intent to use the trademark on numerous products on November 10, 2010.  Further, Hayneedle alleges that defendant "issued a press release 'announcing 'plans to launch a new retail concept catering to the men's big & tall customer' under the trademark THE FOUNDRY BIG & TALL SUPPLY CO. and to sell private label merchandise under the trademark THE FOUNDRY SUPPLY CO."  *Id.* at 5-6.  The press release provides that the defendant intends to "open 10 specialty stores in May 2011, following the April 2011 launch of its ecommerce website and aggressively to expand nationwide to 150 stores by 2013, reaching a total of 300 stores over the next five years."  *Id.* at 8.  The Press Release further

states that The Foundry Big & Tall Supply Co. will offer "extensive assortments of apparel, footwear and furnishings." *Id.*

The evidence adduced at the hearing shows that The Foundary, which is a division of the plaintiff, Hayneedle, Inc., is an online "flash" retail site that markets and sells a wide variety of products to consumers using e-mail messages advertising daily discount sales or "events." The Foundary targets a younger, more hip, more urban, clientele than its parent company. Also, its marketing efforts are specifically targeted at men. It originally sold mostly home decor items and home furnishings, but has expanded its offerings to include many "nonhome" items, including some clothing such as robes and slippers. It sells a wide range of products over the Internet, and its products change frequently. It intends to offer more categories of products as it learns what its target customers want.

It conducted market research to come up with the name, "The Foundary," as well as the design and look and feel of its website. The evidence shows that in conducting a Google search for "the Foundary," Google automatically corrects the spelling to "Foundry" and Hayneedle's "the Foundary" website does not appear as a search result. Jason Goldberger, Vice-President of Marketing and Merchandising for the Foundary, testified that customers will be misdirected to the defendant's potential website if the defendant is not enjoined frm using the name "the Foundary." Further, he testified that their business relies on word of mouth and there is a likelihood of confusion, dilution of their brand, and lost sales as a result of misdirected customers.

Steven Lossing testified on behalf of the defendant. J.C. Penney intends to launch a new retail store, "the Foundry Big and Tall Men's Supply Co.," in several markets this Spring. He testified that clothing has been purchased, leases have been signed,

advertising time has been purchased and employees have been hired in anticipation of the launch. He stated that the "lion's share" of its Spring clothing line was purchased before it received notice of this action.

He testified that the store presently intends to sell only men's apparel and "furnishings." "Furnishings" is a term of art in menswear that describes accessories such as belts and wallets. Lossing testified that the defendant understands the term to mean only menswear accessories and not home decor products or furniture. The company's target market is big and tall men.

He stated that the defendant is planning a website at "www.FoundryBigandTall.com," but estimates that online sales will account for only 5% of their sales. The company conducted market research including focus groups in planning the name and look and feel of the store. The stores are designed to have a masculine feel. He stated that market research showed that its target customers find the description "big and tall" to be condescending and it was advised not to include the term in the name of the store. The defendant nevertheless decided to include "big and tall" in the name to identify the products to its customers. The "big and tall" designation is not included on the label it plans to use in its clothing, however. He stated that there is no intention or plan to drop the term from the name. He also stated that website design has not been completed, but that the company wants a consistent image. The company plans to open twenty stores in 2012, thirty stores in 2013, and eventually to expand to 300 stores.

He testified that the company plans to purchase search terms such as "big and tall" and the names of the cities where they plan to open stores. He stated the company has no intention to operate a "flash" site, nor does it have a present intention to expand into

other categories of products. He acknowledged that its main competitors also sell furniture, etc., targeted to big and tall men, on their websites. He also acknowledged that its products could eventually expand to include such items as watches, cologne, robes and slippers. He testified that the defendant intends to use the mark "The Foundry Big and Tall Supply Co." in its external advertising, "The Foundry" on its private brand dress apparel and "The Foundry Supply Co." on its more casual private label apparel.

He testified that if enjoined from use of the mark, the defendant will lose $684,000 for leases if the launch is delayed for six months, $100,000 for signage, and $1.1 million for advertising, as well as the $649,000 it has spent for private label clothing.

II. DISCUSSION

The extraordinary remedy of a preliminary injunction should not be granted unless the movant has demonstrated: (1) the threat of irreparable harm to it; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that it will succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113-14 (8th Cir.1981) (en banc).[1] No single factor is determinative, although the failure to demonstrate the threat of irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.

---

[1]These factors roughly correspond to the factors recently elucidated by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction"). *eBay* did away with the presumption of irreparable harm in patent cases and reaffirmed the traditional showing that a plaintiff must make. *See Automated Merchandising Systems, Inc. v. Crane Co.*, 357 Fed. App'x 297, 301 2009 WL 4878643, **4 (Fed. Cir. 2009). The First, Second, Fourth and Eleventh Circuits have applied *eBay* in copyright cases. *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008); *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010); *Christopher Phelps & Assocs. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007); *Peter Letterese & Assocs. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1323 (11th Cir. 2008).

5

*See Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir.1996); *see also Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir.1989) (en banc). The burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when, as here, granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits. *Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir.1987). "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council*, --- U.S. ----, 129 S. Ct. 365, 376-77 (2008). In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Id.*

At the early stage of a preliminary injunction motion, the speculative nature of the inquiry into the probability of ultimate success on the merits militates against any wooden or mathematical application of the test; instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. *United Indus. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

   **1.   Irreparable injury**

"'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). Thus, to warrant a preliminary injunction, the moving party must demonstrate a

sufficient threat of irreparable harm. *Id.* When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm. *United Indus. Corp. v. Clorox Co.*, 140 F.3d at 1183 (8th Cir. 1998).

At this early stage of the proceedings, the plaintiff has demonstrated only that the sound of the parties' marks are identical and that Internet search engines either confuse or automatically correct the intentional misspelling of the plaintiff's mark. Because the defendant's enterprise is not yet operational, no additional showing of confusion can be made. The court finds that there is a tendency of the two names to deceive, but that the harm at present is limited to only those products that overlap.

### 2. Balance of harms

A showing of irreparable harm does not automatically mandate a ruling in the plaintiff's favor; the court must proceed to balance the harm to the defendant in granting the injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630-31 (8th Cir. 1991). The court finds that the balance of harms weighs in favor of the defendant. The defendant has shown that it has expended considerable sums of money to launch its retail big and tall men's clothing store and that if enjoined, it will suffer a monetary loss and the employees it has hired will lose their jobs. The plaintiff, on the other hand has only shown that it will be harmed by potential dilution of its brand, misdirection of customers by search engines, and eventual confusion should it enter the market for big and tall men's clothing. There is scant evidence that the plaintiff presently competes in this market, and potential growth into that market is speculative.

### 3. Probable success on the merits

Section 43(a) of the Lanham Act creates civil liability for "any person who . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The ultimate issue on an infringement claim is whether the defendant's mark so resembles the plaintiff's mark that its use was "likely to cause confusion, or to cause mistake, or to deceive." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1053-54 (8th Cir. 2005) (quoting 15 U.S.C. §§ 1114(1), 1127). In the Eighth Circuit, courts apply a six-factor test in assessing the likelihood of confusion: (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase. *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980); *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d at 1053-54. The *SquirtCo* factors guide the analysis, but the ultimate determination of whether confusion is likely is not to be mechanically determined through rigid application of the factors. *Kemp,* 398 F.3d at 1054 (noting that resolution of this issue does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion). Evidence of actual confusion is relevant to the issue of likelihood of confusion, but the absence of such evidence need not create an inference that there is no likelihood of confusion. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992); *see, e.g., United Drug Co. v. Obear-Nester Glass Co.*, 111 F.2d 997,

8

1000 (8th Cir. 1940) ("The similarity of appearance of the two marks, of the spelling, of the sound, and the fact that the marks are used on the same kind of merchandise, all justify the inference that purchasers are likely to be deceived by defendant's mark").

The comparison of the similarity between marks and products must occur in a context that recognizes how consumers encounter the products and how carefully consumers are likely to scrutinize the marks. *Id.* "Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related." *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987). On the other hand, "[a] strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo*, 628 F.2d at 1091. Similarity is based on an examination of the marks as a whole, including visual impression and sound. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965). Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement. *SquirtCo*, 628 F.2d at 1091.

With respect to the degree of competition, no showing of direct competition is required; the factor "degree of competition" requires a broader examination of the products' relationship in the market. *Kemp, 398 F.3d at 1056; see* 15 U.S.C. § 1125(a)(1)(A) (providing for protection against confusion regarding "origin, sponsorship, or approval"); *SquirtCo, 628 F.2d at 1091* ("Competitive proximity is one factor to be considered, even though infringement may be found in the absence of direct competition."). Where products are wholly unrelated, this factor weighs against a finding that confusion is likely; where products are related, however, it is reasonable for consumers to think that the products

9

come from the same source, and confusion, therefore, is more likely. *Kemp*, 398 F.3d at 1056.

Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement. *SquirtCo*, 628 F.2d at 1091; *Kemp*, 398 F.3d at 1057 (stating that "intent as a *SquirtCo* factor is relevant not because trademark infringement requires intent, bad faith, or any other mens rea, " but "is relevant because it demonstrates the junior user's true opinion as to the dispositive issue, namely, whether confusion is likely.").

The court finds the plaintiff has shown some probability of success on the merits. The court finds that the plaintiff has shown that the strength of the plaintiff's mark is strong for a business that has not been in operation long. The plaintiff's and defendant's marks are similar phonetically and the "look and feel" of the plaintiff's online "store" and the defendant's physical retail store are also similar. However, at this point in the litigation, the degree to which the parties' products compete with each other is not great. Generally, consumers will encounter the parties' respective products in different ways. The types of products and conditions of purchase overlap only to the extent that the plaintiff sells men's apparel or the defendant sells things other than men's apparel. The plaintiff operates only on the Internet and the defendant's principal mode of operation will be in retail stores, although it will eventually have a limited presence on the Internet.

There has been no showing of intent by the alleged infringer's intent to "pass off" its goods as those of the trademark owner. The plaintiff has made a limited showing of incidents of actual confusion, largely because the defendant has not yet launched its

products. The plaintiff has shown that the defendant's primary competitors for big and tall men's apparel have expanded into areas and products that directly compete with plaintiff's products and that the defendant is likely to similarly expand in the future. The defendant asserts, however, that it has no present intention to expand into markets that compete with the plaintiff's products. The showings by both parties are necessarily constrained by the preliminary posture of the case. The court finds the probability of success on the merits weighs in favor of the plaintiff, but only to the extent that its trademark encompasses products that are related to the defendant's products.

### 4. The public interest

Preventing consumer confusion is in the public interest. *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 776 (8th Cir. 1994). There is also a strong public interest in obtaining the lowest priced goods. *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d at 505 (stating that "[b]y the very nature of a trademark action, the value placed on free competition must be weighed against any individual's property interest in that trademark, so that the analytic focus should also be on the consumer's ability to obtain the lowest priced goods."). The showing of a likelihood of confusion is not very strong, so the public interest does not weigh heavily in favor of either the plaintiff or the defendant.

The district court has "considerable discretion in fashioning the terms of an injunction," and an injunction must be "tailored to eliminate only the specific harm alleged." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir.1992). Trademark law authorizes courts to apply "principles of equity" in granting injunctions "upon such terms as the court may deem reasonable . . . to prevent a violation under [§ 1125(a) ]." 15 U.S.C. § 1116(a). In determining the appropriateness and scope of injunctive relief,

several factors may be relevant.  See generally Restatement (Third) of Unfair Competition § 35(2) (1995) (listing, for example, the "nature and extent of the wrongful conduct," "any unreasonable delay by the plaintiff in bringing suit," and "the relative harm likely to result" to the parties' interests).  The "likelihood of confusion to consumers is the critical factor" in determining the breadth of the injunction.  *Internet Specialties W. v. Milon-DiGiorgio Enterprises, 559 F.3d 985, 993 n.5 (9th Cir. 2009)*.

III.  CONCLUSION

The court finds that a narrowly-drawn injunction aimed at avoiding confusion between the two companies' products, pending resolution of the merits of the plaintiff's claim, is an appropriate resolution at this stage of the proceeding.  The court finds that the defendant should not be enjoined from all use of the allegedly infringing marks, "The Foundry," "The Foundry Supply Co.," and "The Foundry Big and Tall Supply Co.," but its use must be limited to big and tall men's apparel and furnishings.  The parties only tangentially compete in that market.  The defendant has demonstrated that it will be harmed if enjoined from all use of the marks.  Allowing the launch of the defendant's stores, limited to big and tall men's apparel and furnishings only, comes closest to maintaining the status quo until the issues in the litigation are resolved.  The defendant will be enjoined from using the mark on any other merchandise and from selling other merchandise, either online or in its physical stores, pending the resolution of the merits of this action.  The court further finds that no bond is necessary.  Accordingly,

IT IS ORDERED:

1.  The plaintiff's motion for a preliminary injunction is granted in part and denied in part, in conformity with this Memorandum and Order.

2. The defendant is enjoined from using the mark "the Foundry" or "the Foundry Big and Tall Men's Supply Co." or "The Foundry Supply Co." on any merchandise, product, or service other than big and tall men's apparel or furnishings, and from advertising or selling any merchandise, product or service, other than big and tall men's apparel or furnishings, either online or in its physical retail "Foundry Big and Tall Men's Supply Co." stores, pending the resolution of the merits of this action.

DATED this 16th day of March, 2011.

BY THE COURT:


s/Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.